LESSEE OF GABRIEL SWAYZE, AND MARY HIS WIFE, PLAINTIFFS IN ERROR V. ROBERT BURKE, D. SHERMAN, GEORGE JACKSON, AND JAMES HINSMAN, DEFENDANTS

Ejectment. John Ormsby died in Alleghany county, Pennsylvania, in December, 1805, having a son Oliver, who administered to his estate. He had also a son who had married in Mississippi, and who died in 1795, leaving an infant daughter. Oliver Ormsby filed no inventory of the estate of his father, and never settled an account as administrator; and in 1826, he confessed a judgment in favour of the Messrs. Penns, for a part of the purchase money of a valuable real estate, which had been held by John Ormsby, in his lifetime. In the suit against him for this debt, Mr. James Ross acted as the attorney for the plaintiffs; and in 1827, the real estate was sold under an execution issued by Mr. Ross on the judgment, and was purchased by Mr. Ross for three thousand dollars; he having, before the purchase, given Oliver Ormsby to understand, and having publicly declared, that he would hold the property as a security for the debt due to the Messrs. Penns; and on the payment of the debt, that he would relinquish all claim to it. In April, 1831, Oliver Ormsby paid the debt to Mr. Ross, and took a conveyance of the property. At the same time, he gave a receipt, as administrator of John Ormsby, to the sheriff, for the balance of the three thousand dollars. He claimed to hold the property, so purchased, as his own. In March, 1828, Oliver Ormsby wrote to the wife of the plaintiff in this ejectment, who was the daughter of John Ormsby, junior, stating that his father had not left more property than would pay his debts. There was evidence, that less than one-tenth of the real estate would have satisfied the judgment, for which the land was sold to Mr. Ross. Mr. Ross had no knowledge of any fraudulent purpose of the administrator. The daughter of John Ormsby, junior, having intermarried with Gabriel Swayze, with her husband, brought an ejectment, to recover a moiety of the land which was held by Oliver Ormsby, under the conveyance from Mr. Ross. The court instructed the jury, that "in matters of fraud, courts of law and chancery have a concurrent jurisdiction. It is, therefore, within the province of the jury, to inquire whether the conduct and proceedings of Oliver Ormsby, whereby the legal title to the property in dispute, became vested in himself, for his exclusive use and benefit, were in fraud of his co-tenant, Mary Swayze; and if they were, the verdict ought to be for the plaintiffs." "That the fraud should be brought to the knowledge of Mr. Ross; and that, if Mr. Ross took a valid title under the sheriff's deed, the title of his vendee would be good, under the circumstances disclosed in the evidence." By the Court:—We think that the judge erred, in charging the jury that the deed to Ormsby was valid, unless they should find that Ross participated in the fraud.

It is clear that a purchaser at sheriff's sale, cannot protect himself against a prior claim, of which he had no notice; or be held a bona fide purchaser, unless he shall have paid the money.

That fraud is cognizable in a court of law, as well as in a court of equity, is a well established principle. It has often been so ruled in this court.

As there is no court of chancery under the laws of Pennsylvania, an action of ejectment is sustained, or an equitable title, by the courts of that state. Such is not the

practice in the courts of the United States; and if the plaintiffs in an ejectment, fail to show a paramount legal title in themselves, they cannot recover.

IN error to the district court of the United States for the western district of Pennsylvania.

The case, as stated, in the opinion of the court was as follows:—

An action was instituted in the district court of the United States for the western district of Pennsylvania, by the lessors of the plaintiffs, Gabriel Swayze and wife, citizens of the state of Mississippi; for the recovery of a tract of land in Alleghany county, in the state of Pennsylvania, to October·sessions, 1833.

The plaintiffs and the defendants claimed the land under a deed from John Penn, and John Penn, junior, proprietaries of Pennsylvania; the land forming part of one of the manors reserved by the proprietaries. John Ormsby died intestate in 1791, and left a son, named Oliver, a daughter, Sidney, who intermarried with John Gregg; a son named John, who married and died in the state of Mississippi; leaving a daughter Mary, an infant, at the time of his decease; and who has since intermarried with Gabriel Swayze, the plaintiff in error. In December, 1807, Oliver Ormsby administered to the estate of his father, John Ormsby, and gave the usual administration bonds; but he filed no inventory of the estate of the intestate; nor did he, at any time, settle an account of his administration of the estate.

The estate of John Ormsby, deceased, was indebted to John Penn, and John Penn, junior, for the land purchased from them, in the sum of four hundred and sixty-seven dollars and sixty-four cents; and on the 6th of September, 1826, the administrator confessed a judgment in their favour, for the amount of the debt; upon which judgment, an execution was forthwith issued by Mr. Ross, their attorney, and the land of John Ormsby was levied on and sold; Mr. Ross being the purchaser of the same, for three thousand dollars. At the time of the purchase of the estate, Oliver Ormsby, the administrator, was absent. Mr. Ross declared, in the most public manner, that Ormsby, the administrator, or any of the family of the deceased John Ormsby, might redeem the land at any time, on the payment of the debt and interest. Before the sale, Oliver Ormsby, the administrator, was informed by Mr. Ross, that he only wanted the money due upon the judgment, and that he did not intend to buy the land to hold it. Ormsby, the administrator, was in possession of the land at

[Swayze and Wife v. Burke et al.]

the time of the sale, and continued in possession of it: and at the time of the sheriff's sale, or when the deed for the land was made to him, by the sheriff, Mr. Ross paid no money. The rents and profits of the land were continued to be received by Oliver Ormsby; and in April, 1831, he paid to James Ross, Esq. the sum of five hundred and twenty-three dollars, the amount of the judgment, and the interest due thereon, and took from him a conveyance of the land in fee simple; giving to the sheriff, at the same time, as administrator of John Ormsby, a receipt for the sum of three thousand dollars, less five hundred and twenty-three dollars, the amount of the payment to James Ross, Esq. in satisfaction of the debt due to the Messrs. Penns. The land consists of eighteen coal hill lots, and of thirty-five acres of land adjoining to them, and is now of great value. It was highly valuable at the time of the sheriff's sale. The defendants were in possession of the property as tenants of Oliver Ormsby, when the suit was commenced.

In March, 1828, in answer to an application for information as to the value of the estate of John Ormsby, by Mrs. Swayze, one of the lessors of the plaintiff, Oliver Ormsby wrote; "My father, at his death, was not possessed of more property than a sufficiency to pay his debts, having, from time to time, sold to individuals, and conveyed to his children." Evidence was also given, conducing to prove, that by a sale of two of the coal lots, the judgment could have been satisfied.

The case was tried at October term, 1835, and a verdict and judgment were rendered for the defendants, under the charge of the district judge. The plaintiffs excepted to the opinion of the court, and prosecuted this writ of error.

On the trial of the cause, the counsel requested the district judge to charge the jury, "in matters of fraud, courts of law and chancery have a concurrent jurisdiction. It is, therefore, within the province of the jury, to inquire whether the conduct and proceedings of Oliver Ormsby, whereby the legal title to the property in dispute became vested in himself, for his exclusive use and benefit, were in fraud of the rights of his cotenant, Mary Swayze; and if they were, the verdict ought to be for the plaintiffs." The court gave the instruction as requested, with this qualification, that the fraud should be brought to the knowledge of Mr. Ross; if he took a valid title, under the sheriff's deed, the title of his vendee would be good, under the circumstances disclosed in the evidence.

[*Swayze and Wife v. Burke et al.*]

The argument of Mr. Fetterman, for the plaintiffs in error, and of Mr. Watts, for the defendants, was submitted to the court in writing, at the close of January term, 1836.

Mr. Fetterman contended, that it is now an admitted maxim at law, that fraud is cognizable at law as well as in equity; and whether that inquiry can be made in an action of ejectment, is the question. This court, in the case of Sayre's Lessee v. Ormsby et al. 8 Peters' S. C. R. 252, says, "it is an admitted principle, that a court of law has concurrent jurisdiction with a court of chancery in case of fraud; but when matters alleged to be fraudulent are investigated in a court of law, it is the province of the jury to find the facts, and determine their character, under the direction of the court." It is worthy of remark, that that was an action of ejectment.

We find, also, that as early as Fermor's case, 3 Rep. 77, A. the principle settled, "that fraud vitiates all transactions;" so in 10 John. 462, Jackson ex dem. Gilbert v. Burgett, which was an action of ejectment; Kent, chief justice, in delivering the opinion of the court, says, "courts of law have concurrent jurisdiction in all cases of fraud. Fraud will invalidate in a court of law as well as in a court of equity, and annul every contract and conveyance connected with it; a fraudulent estate is as no estate in judgment of law." Lord Mansfield, in the case of Cadogan v. Kennett, Cowp. 434, says, "the principles and intent of the common law, as now universally known and understood, are so strong against fraud in every shape that the common law could have attained every end effectuated by the statutes of Elizabeth:" and the same judge, in Bright v. Eynon, 1 Burrows, 395, remarks, "fraud or covin may, in judgment of law, *avoid* every kind of act." Courts of equity and courts of law have a *concurrent* jurisdiction to suppress and relieve against fraud. So judge Parsons, in Boyden v. Hubbard, 7 Mass. 112, "but when a court of law has regularly the fact of fraud admitted or proved, no good reason can be assigned why relief shall not be obtained there." So in 18 John. 111, which was the case of an ejectment in an alleged fraud in a sheriff's sale, the same principle is expressly reaffirmed; also, in Fleming v. Slocum, same book, 403–4; and in Pennsylvania, in 2 Watt's Rep. 66, Gilbert v. Hoffman, which was an action of ejectment, justice Rogers, in delivering the opinion of the court, reiterates the same principle: "a *covinous* conveyance of land, is as *no* conveyance against the interest intended to be defrauded." "It is certainly not the duty of a court

to protect the interest of a person who has been detected in an attempt at fraud."

"The devisee or heir whom the vendee attempted to defraud, for the attempt affects him as well as creditors, asks the aid of the statute against this fraudulent conveyance, on the ground that his title cannot be affected by a fraudulent sale. His remedy is strictly at law, for fraud is cognizable in a court of common law, as well as in a court of equity. A fraudulent vendee has no equity, and is not entitled to claim the protection of law on that ground." In this case, as well as in the cases of Ridell v. Murphy, 7 Serg. & Rawle, 230; Bownes' Lessee v. Craft, 8 Johnston, 118; Lazarus v. Bryson, 3 Binney, 53, 54; 5 Cowen, 67, 78; Johnston's Ferry v. Harvie, 2 Penn. Rep. 93; were actions of ejectment, in which the question of fraud was considered as proper matter of inquiry.

Unless, according to the opinion of the judge of the district court, Mr. Ross is guilty of fraud, the plaintiffs cannot recover; no matter how fraudulent the intentions and conduct of Oliver Ormsby may have been. The heir of John Ormsby cannot recover from Oliver Ormsby, unless she proves that Mr. Ross was particeps criminis. The debt for which the property was sold, was due at the death of John Ormsby; its existence was known to Oliver Ormsby, his administrator; he promised to pay it in 1820.

In Pennsylvania, lands have always been assets for the payment of debts. Graff v. Smith's Administrators, 1 Dallas, 481; Morris v. Smith, 1 Yeates, 238. Either to an action of debt, as a cause of action, or when resort must be had to a scire facias, after the death of the debtor; it issues not against the heirs, upon whom the law casts the inheritance; but against the executor or administrator, who, so far as relates to the payment of the debts, is the trustee of the real estate. Rogers v. Rogers, 1 Hopkins' Chancery Reports, 526–7, a case very similar to this, and in Brown v. Webb, 1 Watts' Reports, 411.

How does it become material to show that Mr. Ross was guilty of fraud?

It is alleged that Ormsby was guilty of an attempt to defraud his co-heirs out of this property; and if he was guilty of such, how can his situation be either benefited or injured by the fact that Mr. Ross was or was not equally guilty of the fraud? The law abhors all kind of fraud, whether open or by any kind of indirection; and when the action is against the party guilty of the fraud, or his heirs, it is

not for him or his heirs to shelter themselves from the consequences of his own wicked designs. As early as Tresham's case, 9 Reports, 110, in an action against an administrator, it was resolved by the court, on the 4th point of the case, " That although a general allegation of covin, which, as held in Talboise's case, ought to be between two or more, would be sufficient; yet *a fortiori*, in case of fraud which may be in the heart of one only; for if one by deed make a fraudulent gift of his goods to divers who knew not of it, it is fraudulent in him who makes it. And so it was adjudged in Turner's case, 8 Reports, 133, A. that fraud may be in one or one party only: and again, in the same case, the court say that fraud may be committed by one alone: and in Turner's case, the court held, that although an administrator may lawfully confess a judgment in favour of one creditor, yet if that creditor afterwards is satisfied, or offers to compromise, and offers to take sixty pounds for one hundred pounds, and the administrators do not do it, to the intent that the judgment may stand in force, so that third persons may be defrauded, and the administrators convert the deceased's goods to their private use, which is altogether against their office and the trust reposed in them; and therefore, be such agreement either precedent, before the recovery, or subsequent after the recovery, it is all one as to the creditor, who is a third person; for he is defrauded as well by the subsequent agreement as by the agreement precedent: and in 2 John Ct. 42–3, it is ruled that a deed, fraudulent on the part of the grantor, may be avoided. though the grantee may be a bona fide purchaser and ignorant of the fraud.

This brings us to the important inquiry in this case, whether an executor or administrator, or any other individual standing in a fiduciary capacity, can purchase the real estate, either directly or indirectly at a public sale, occasioned by his own neglect and misfeasance, as in this, and hold the same to the exclusion of his coheirs; upon this point the books are full of authority. Courts both of law and equity have reiterated the position that it cannot be done. The law will not thus suffer a man to be led into temptation by taking away from him all inducement to fraud. The general principle is strongly laid down in the able commentaries of Mr. Justice Story on Equity, 318. The principle applies, however inconvenient to purchasers in any given case; it is poisonous in its consequences: and the same principle is advocated by chancellor Kent, in his Commentaries, vol. 4, 438–9.

On this point there was also cited Wormley v. Wormley, 8 Wheat. 441; 1 Mason's C. C. R. 241, 345; Davone v. Fanning, 2 John. Chan. Rep. 252; Lazarus v. Bryson, 3 Binney, 54; Moody v. Vandyke, 4 Binney, 43; Rham v. North, 2 Yeates, 118; Lambreton v. Smith, 13 Serg. & Rawle, 310; Rogers v. Rogers, Hopkins' Chan, Rep. 527;. Downes v. Gray, Trustees, et al. 3 Merivale, 200; Nilthrop v. Pennyman, 14 Ves. 510; Whelpdale v. Cookson, 1 Ves. sen. 9; Ex parte Lacy, 6 Ves. 626; Lester v. Lester, 6 Ves. 630; 1 Powell on Mortgages, 124; Coles v. Trecothrick, 9 Ves. 234; Evertsam v. Tappan, 5 John. Chan. Rep. 439. After referring to these cases, we may appeal to the facts of this case, and confidently ask, where was the necessity of proving that Mr. Ross lent himself to the fraudulent intentions of Oliver Ormsby; before we can recover from trustees the estate he and they held by fraud. It is humbly imagined, in this part of the case, the learned judge was in error. An individual may concert a scheme of fraud, he may employ a hundred different agents, they may each believe his intentions perfectly honest—they, as in this case of Mr. Ross, may not know that there were other lawful heirs to the estate, except Ormsby and his lunatic sister, then partly under his care—they may each believe his intention pure: and yet we must prove them all parties and privies to the fraudulent intentions of the maker of the fraud, before we can defeat the estate so unfairly acquired. How was Mr. Ross to know whether there was personal property to pay the debts? How was he to know that Mrs. Swayze was an heir, residing in Mississippi? How was he to know that Oliver Ormsby had been guilty of falsehood to her; that in 1828, a year after the sheriff sold, before a dollar was paid either by Ross or Ormsby, that Ormsby had written to her, telling her his father had left no property? Yet Oliver Ormsby knew all these things, and the court say, although he was guilty of fraud, yet the plaintiffs cannot recover, unless Mr. Ross was also guilty of it. In considering that part of the charge of the court connected with this point, we do not wish to scan it nicely, but to give it a fair and liberal construction; and in doing so, must observe, that it neither corresponds with the facts of the case, nor the law of the land; as we understand it. It is all true that Mr. Ross attended at the sheriff's sale, and had the property knocked off to him in the lump, "chilling by his presence the sale," saying, "if Ormsby or any of his family can get able to redeem it, he, or any of his family, might have it on paying the debt and interest:" the very effect of a declaration of this kind, would be

to prevent the property from bringing its full value. Ross never interfered with Ormsby in the possession of the property—paid no money to the sheriff, and there was no money paid until 1831, when Ormsby paid Ross the amount of the judgment, and receipted to the sheriff, as administrator of his father's estate, for the balance of the bid at the sale. How then could the court take the facts of the case from the jury, and say "that Mr. Ross, who never paid a dollar, was a bona fide legal purchaser—that he bought for himself, not as a trustee for Ormsby or any body else?"

It was relied on, as one of the strong circumstances conducing to prove fraud, that there was no change of possession. It may also be well asked to whom did the property belong, when Ormsby receipted to the sheriff, as administrator of his father's estate? The property is paid for, if paid at all, with the money of the heirs of John Ormsby. Without their consent, no man and no court had a right to convert more of the real estate into money, than was sufficient to pay the debts. We have here the case of an administrator purchasing at sheriff's sale, individually, and paying for the land with the plaintiffs' money. Can plaintiffs resort to the land? In 1 Serg. & Rawle, 144, when real estate was bought by a guardian, with the funds of his wards, the land was treated as theirs; and his making the conveyances to himself exclusively, was held fraudulent of itself: what is this but the ordinary case of a man purchasing with the money of others, and taking the deed in his own name? See 2 Watts' Penn. Rep. 324; Kisler v. Kisler, and Law v. Doighton, Ambler's Rep. 406; Lench v. Lench, 10 Vesey, 506; and Waite v. Whorewood, which was the case of an executor, in 2 Atkyns, 159; Wolf v. Smyser et al. 2 Penn. Rep. 347. So in Hempstead v. Hempstead, 2 Wendel, 199. It is expressly said by the court, that cestui que trusts, who have paid the consideration money of land patented in other names, may maintain ejectment. See opinion of the court, page 134. In Fellows v. Fellows, 4 Cowan's Rep. it was decided that an administrator who buys land on a judgment of his intestate, must account for it to his cestui que trusts; he was an agent and trustee, and could not divest himself of the trust. Cited also, on this point, the case of Hamilton, Guardian, 17 Serg. & Rawle, 144; Rogers v. Nicholson, 2 Yeates, 516; Griffin v. Jones, 6 Wendel, 522; Craig v. Sprague, 12 Wendel, 46; Bowman's Lessee v. Craft, 18 John. 110; Jackson v. Newlin, 18 John. 362; Woods v. Monell, 1 John. Chan. 502; Shad v. Course, 4 Cranch, 403; Sampson v. Sampson, 4 Serg. & Rawle, 320; Greenleaf v. Burk, 9 Peters, 292; 2 Watts' Penn.

[Swayze and Wife v. Burke et al.]

Rep. 494, 495; Commonwealth v. John Breed, 4 Pick. 460; Benham v. Craig, 11 Wendel, 83; Bryden v. Walker, 2 Harris & John. 292; 8 Cowen, 406; 4 Wendel, 303; 2 Watts' Penn. Rep. 66; 7 Wendel, 438; 2 Mason, C. C. R. 536; Rhoades & Snyder v. Selin, 4 Wash. C. C. R. 720.

Mr. Watts, for the defendants in error, upon the exception taken by the counsel for the plaintiff to the charge of the court, that fraud must be brought to the knowledge of Mr. Ross, and that the title derived from him was good in his vendees, contended that this point involved a question of law and a question of fact. As to the question of law, that the court had jurisdiction of the subject matter of controversy, the court answered it as requested by the plaintiff; for the whole cause, the charge of the court, the verdict and judgment was based upon the fact that the court did entertain jurisdiction. And as to the matter of fact, whether the conduct of Oliver Ormsby was fraudulent or not, it was expressly referred to the jury to determine. Any other direction by the court would have been erroneous. This point necessarily raises the question, whether the conduct of Ormsby was fraudulent? The argument of the plaintiff assumes the fact, that Mr. Ormsby was the trustee of the heirs of his father, John Ormsby, deceased. In Pennsylvania, there is no kind of connection between the administrator of the personal estate, and the interests of the heirs, as regards the real estate; as to the realty, the administrator is as a perfect stranger; and, upon a sale of it by the sheriff, upon an execution, he may become the purchaser. Cases have been cited, in the argument of the plaintiffs' counsel, to show that an administrator cannot become a purchaser of land sold by himself; also, that fraudulent conduct of an administrator, in making sale of land, will vitiate it. This is true, but it is difficult to discover what application it has to the law of this case. Whenever an administrator makes a sale of land in Pennsylvania, he does not do it as an administrator *ex officio*, but by a special order of the orphans' court, for some particular purpose; such as the payment of debts. In such case, he cannot be the vendor and the vendee; and, it is equally plain, he must act fairly in conducting such sale: and this is the principle established by the cases referred to.

If the plaintiff had it in his power to show that personal estate of John Ormsby had come to the hands of his administrator, O. Ormsby, to an amount sufficient to pay the debt of the Penns; and that he had

not paid it, but suffered the land to be sold, and become the purchaser himself, there would have been some pretext for the argument, that O. Ormsby's title was fraudulently obtained: but, as the facts are, and the proof in the cause is, that, although O. Ormsby did take out letters of administration, no estate ever came to his hands to be administered, or which, by law, was applicable to the payment of the debts of the intestate; no trust, in relation to the land in dispute, existed between the parties to this action; and Oliver Ormsby was as competent to become the purchaser at sheriff's sale, as any other individual. But he did not thus purchase.

When James Ross purchased the land, he purchased it for himself; and, if he be believed, he never had any previous understanding or arrangement with O. Ormsby on the subject. His object was, first, to secure the debt due to the Penns; and that accomplished, he was willing to convey to O. Ormsby his title to the land, upon being released from the payment of the balance of the purchase money, after Penn's judgment was paid. Mr. O. Ormsby agreed to take the land from him at the price he had paid for it. Who were defrauded? The heirs of John Ormsby? By whom? Mr. Ross expressly says that O. Ormsby was not present at the sale, that he was away from home, and when he returned he told him of it: he also says that, at the time of the sale, his intention was, and he said, at the time the property was sold, if Mr. Ormsby or any other of his family was able to redeem it, he might have it on the payment of the money. At that period, these lots were of very little comparative value; and perhaps O. Ormsby was the only individual who would have given for them the price at which they sold at sheriff's sale.

O. Ormsby gave his receipt to the sheriff for the balance of the purchase money, after the payment of the lien for which the land was sold, thus charging himself as administrator, and his security in the administration bond, with this money, for which he was accountable to the heirs. Under the facts of this case, it is quite impossible that there could have been fraud on the part of O. Ormsby alone; if fraud was committed, James Ross must have been a party to it: for, if he were a *bona fide* purchaser of the land at sheriff's sale, all idea of fraud, subsequently committed, is out of the question; for O. Ormsby never had one trait of the character of a trustee with respect to this land. The conveyance by James Ross to him, is absolute and unqualified by any trust; and, it is not pretended to be shown, that O. Ormsby purchased the land in trust for the plaintiff. It was pertinently re-

marked by the court below, in. their charge to the jury: " Suppose the property. had depreciated in value' after he received the conveyance from Mr. Ross, would he have been permitted, under the circumstances disclosed, to cast it upon the estate of John Ormsby, and to cancel his liability arising from his. receipt to the sheriff? But the' claim of the plaintiff is founded upon an alleged-fraud of O. Ormsby: and the answer to it is, that it most manifestly appears, that, before he did one act, or uttered one syllable in relation to the land in controversy, there was an indefeasible, legal title vested in James. Ross, by a judicial sale. O. Ormsby was bound by no legal or moral obligation to accept James Ross's offer to permit him to redeem; and, if he did accept it, it was upon the terms mentioned in the deed, by which the transaction was consummated and the title vested in him.

But, it is said, that a number of lots were levied on in mass, and so sold, instead of having been separated. What had O. Ormsby to do with that? If heirs or creditors were injuriously affected by it, their remedy was to apply to the court to set the sale aside: but that was not done: nor have the defendants, upon the trial of this cause, pretended to prove that the lots were worth one dollar more than the price for which they sold.

The question of fraud, being a matter of fact, was distinctly submitted to the jury by the court; and they have found against the allegation.

Mr. Justice M'LEAN delivered the opinion of the Court.

An action of ejectment was brought in the western district of Pennsylvania, by the plaintiffs against the defendants, to recover the land in controversy. Both parties claim by descent from John Ormsby, sen. who died in Alleghany county, Pennsylvania, in December, 1805. The deceased had a son, Oliver, who survived him, and who administered on. his estate; and a daughter, Sidney, who married Isaac Gregg. He had also a son called John Ormsby, jun. who married in the Mississippi country, and died in August, 1795. Mary Swayze, the wife of the plaintiff, is the daughter of this son; and was an infant at his decease.

In December, 1807, Oliver Ormsby gave bond as administrator of his father; but it seems he filed no inventory of the personal estate, as the law required, nor did he ever settle his administration account.

On the 6th September, 1826, as administrator, he confessed a

[Swayze and Wife v. Burke et al.]

judgment for four hundred and sixty-seven dollars and sixty-four cents, in favour of Messrs. Penns, Mr. James Ross acting as the attorney of the plaintiffs. An execution was issued on this judgment, and the premises were sold to Mr. Ross for three thousand dollars. He declared, publicly, at the sale, that Ormsby or any of his family might redeem the land, at any time, on the payment of "debts and interest;" and Mr. Ross further states, that before the sale, Mr. Ormsby was informed that he only wanted the money on the judgment, and that he did not intend to buy the land to hold it.

No money was paid by Mr. Ross at the sheriff's sale, or at the time he received the sheriff's deed. Ormsby remained in possession of the land, receiving the rents and profits; and in April, 1831, four years after the sheriff's sale, he paid Ross five hundred and twenty-three dollars, the amount of the judgment and interest; and received from him a conveyance of the land. At this time, Ormsby receipted to the sheriff, as administrator, for the balance of the three thousand dollars, after deducting the amount paid to Ross. The sheriff's deed to Ross, and the deed from him to Ormsby, were recorded on the same day.

The land in controversy consists of eighteen coal-hill lots near Pittsburg, and thirty-five acres adjoining them, and which is now of great value; and was worth a large sum at the time of the sheriff's sale.

There was a letter in evidence, written by Oliver Ormsby to Mrs. Swayze, dated 19th March, 1828, at Natchez, in which he says: "My father, at his death, was not possessed of more property than a sufficiency to pay his debts; having, from time to time, sold to individuals, and conveyed to his children." And there was evidence conducing to show, that the sale of two of the lots would have satisfied the judgment.

On these facts and others in the case, the counsel for the plaintiffs prayed the court to instruct the jury, that, "in matters of fraud, courts of law and chancery have a concurrent jurisdiction. It is therefore within the province of the jury to inquire whether the conduct and proceedings of Oliver Ormsby, whereby the legal title to the property in dispute, became vested in himself, for his exclusive use and benefit, were in fraud of his co-tenant, Mary Swayze; and if they were, the verdict ought to be for the plaintiffs." This instruction was given, as requested, with this qualification, "that the fraud should be brought to the knowledge of Mr. Ross; and that, if he took a valid title under the sheriff's deed, the title of

[Swayze and Wife v. Burke et al.]

his vendee would be good, under the circumstances disclosed in evidence."

.To the refusal of the instruction as requested, and the instruction as given, an exception was taken; which raises the question of law, whether, to render the title of Ormsby, as set up. by the defendants, inoperative and void, it is essential that Ross should have participated in the fraud.

The charge of the judge was explicit on this point. He not only instructed the jury, that, to make the title of Ormsby fraudulent, Ross must have had a knowledge of the fraud; but assuming, it would seem, the province of the jury, he declared that the fairness of the transaction was above suspicion.

That fraud is cognizable in a court of law, as well as in a court of equity, is a well established principle. It has been often so ruled in this Court.

As there is no court of chancery under the laws of Pennsylvania, an action of ejectment is sustained, on an equitable title, by the courts of that state. Such is not the practice in the courts of the United States; and in this case, if the plaintiffs fail to show a paramount legal title in themselves, they cannot recover.

It is. unnecessary to inquire, whether, under the circumstances, Ormsby did not receive the conveyance of the land from Ross, in trust, for the heirs of his father, generally. This inquiry would be appropriate in the exercise of a chancery jurisdiction, on a bill framed for the purpose. But the jury were limited to the question of fraud. The deed by the sheriff to Ross, and the one from him to Ormsby, contain upon their face all the requisites of legal conveyances; and they must be operative to convey the title, unless the circumstances under which they were executed make them void.

. In 1807, Ormsby took out letters of administration; but he seems to have acted, in the management of the estate, without regard to the law, or the obligations of his administration bond. He filed no inventory, made no settlement of his accounts. In 1825, he promised to pay the debt in the hands of Ross, but he took no step to fulfil this promise. It was his duty, as administrator, to make application to the orphans' court for authority to sell as much of the real estate as would pay the debt. But, to obtain this order, it would have been necessary to show that the personal assets were exhausted.

In 1826, he confessed a judgment, and suffered an execution to be taken out, and the property in controversy to be sold. He remained

in the undisturbed possession of the property, enjoying the rents and profits; and then received a conveyance of the land from Ross, on the payment of the judgment, and receipting to the sheriff for the balance of the purchase money. And, prior to this time, by his letters, he informs Mrs. Swayze, who lived in Mississippi, and still resides there, that the property left by his father would all be consumed in the payment of debts.

In deciding the question of law raised by the exception, it may not be proper for this Court to say whether these facts do not show fraud in the administrator. The facts were properly before the jury, and it was for them to determine the question of fraud. But, may Ormsby and his representatives hold the land under their deed, unless it shall be shown that Ross participated in the fraud?

A bona fide purchaser, without notice, is not affected by the fraud of his grantor; and it is admitted that a conveyance by such purchaser, to a person who may have knowledge of the fraud, would be valid. But, the purchase and conveyance of Ross, cannot be considered as coming within this rule.

In the first place, Ross did not purchase with the intention of holding the property. This was declared publicly at the sale; and some time before it took place, the same determination was made known by him to the administrator. And, in the second place, it appears the purchase was never perfected by Ross. He received the sheriff's deed, but he paid no part of the consideration. In this state the matter remained four years; and until the administrator paid the judgment, and receipted to the sheriff for the residue of the purchase money. On this payment, he received a deed from Ross; and then he caused the sheriff's deed to be placed on record.

In making the purchase, Ross seems to have had no design to aid the administrator in the perpetration of a fraud, if such were his intention: or to defeat or embarrass the claims of the heirs of John Ormsby, sen. By the proceeding, he was desirous of securing the debt placed in his hands for collection; and, for the payment of which, he felt himself personally responsible. The judgment, and the sale of the land, secured the desired object. It might have been secured by the judgment only.

The purchase, at the sheriff's sale, was not made by Ross on his own account, or for the benefit of the plaintiffs in the judgment. Having fixed a lien on the land by the judgment and sale, he did not desire to complete his purchase by the payment of the money.

[Swayze and Wife v. Burke et al.]

And, it is clear that a purchaser at sheriff's sale, cannot protect himself against a prior claim, of which he had no notice; or be held a bona fide purchaser, unless he shall have paid the money.

Had the administrator, under the circumstances of this case, become the purchaser at the sheriff's sale, could he have held the land as a bona fide purchaser? His omissions of duty, in failing to account for any assets which may have come into his possession, and his neglect to apply to the orphans' court, for authority to sell a part of the real estate to pay the debt, connected with the judgment and the proceedings under it; are facts from which a jury might, in the exercise of their judgment, have inferred fraud.

Had the administrator fraudulently furnished an agent with money, and employed him to purchase at the sheriff's sale, could a title thus acquired be held valid against the heirs of John Ormsby, sen. though the deed might have been made to the agent? The agent may be supposed to have been made the innocent instrument of fraud, by the administrator; and whether the title apparently remained in the agent, or had been conveyed to the administrator, could not the fraud be inquired into at law?

There may not have been, in terms, an agreement between Ross and the administrator, that the purchase should be made at the sheriff's sale, by the former, as agent of the latter. But, before the sale, the administrator was assured by Ross, that he would not purchase to hold the land; and his high character was a sufficient guarantee on the subject: and may not this conduce somewhat to show to a jury why the eighteen lots, and the thirty-five acres adjoining, were sold on the execution, when the sale of two or three of the lots would, probably, have satisfied the judgment? The money was paid by the administrator.

In making the purchase, Ross seems, in effect, to have acted as the agent of the administrator; and it was proper for the jury to inquire whether the transaction was not fraudulent. If the administrator suffered the land to be sold, through the agency of Ross, with the view of securing the title to himself, to the exclusion of the other heirs of his father, the proceeding was fraudulent and void. And, as Ross could not be considered a bona fide purchaser, against the legal and equitable right of the plaintiffs, he not having paid the purchase-money; the deed which he executed to Ormsby is not a bona fide conveyance. Had the plaintiffs brought their action against Ross, he could not have defended himself, under the sheriff's deed;

VOL. XII.—D

without showing the payment of the consideration. Nor is this deed a good defence against the right of the plaintiffs, under the circumstances of the case, when set up by Oliver Ormsby or his representatives. To the objection already stated to the title of Ross, may be superadded all the circumstances going to show fraud in the administrator; and of which the jury are the proper judges.

We think, therefore, that the judge erred in charging the jury that the deed to Ormsby was valid, unless they should find that Ross participated in the fraud; and, on this ground, the judgment of the court below is reversed, and the cause remanded for further proceedings.

This cause came on to be heard, on the transcript of the record from the district court of the United States, for the western district of Pennsylvania; and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the district court be, and the same is hereby reversed; and that this cause be, and the same is hereby remanded to the said district court, with instructions to award a venire facias de novo.