SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,

v.

Thomas Edward CAVANAGH, U.S. Milestone, Frank Nicolois, Karen Cavanagh, Beverly Nicolois, Cromlix, LLC, and Thomas A. Hangtes, Defendants–Appellants,

Electro–Optical System Corp., George Chachas, Thomas R. Brooksbank, The Estate of William N. Levy, deceased, by and through his executrix, Marlene Levy, Optimum Fund, Agira Trading, Customer Safety, S.L., Cambiares, S.L., Construcciones Solariegas, S.L., Cosimo Tacopino, Maier S. Lehman, James E. Franklin, Donald & Co. Securities Inc., SHBL Associates Europe Ltd., Joseph Falco, Martin Hodas, Bernd Stieghorst, Erin Martin, Ana P. Lopez, Tamar Lehman, Metropolitan Trade Finance Ltd., Tim Timlin, Carmillo Monastra, Eugene Stricker, Arthur De Acutis, Jean–Pierre Neuhaus, Kenneth C. Kehoe, Antonio V. Borotto, Anthony S. Luttenberger, Shlomie Zarchy, Florida Pension Fund Inc., Inversoa Dactiler, S.L., Edward C. Kaufer, The Owners of Account No. 13601, and Baja Ltd., Defendants.

Docket Nos. 04–5402–CV(L), 04–5422–CV(CON), 04–5708–CV(CON), 04–6363–CV(CON).

United States Court of Appeals, Second Circuit.

Argued: Sept. 9, 2005.

Decided: April 10, 2006.

Paul A. Batista, New York, NY, for Defendants–Appellants Thomas Cavanagh, Frank Nicolois, U.S. Milestone Corp., Beverly Nicolois, Karen Cavanagh, and Cromlix, LLC.

Thomas R. Brooksbank, Phoenix, AZ, pro se.

Gregory J. Sherwin, Fields, Fehn & Sherwin, Los Angeles, CA, for Defendant–Appellant Thomas A. Hantges.

Melinda Hardy, Assistant General Counsel (Giovanni P. Prezioso, General Counsel, Richard M. Hurnes, Associate General Counsel, Philip J. Holmes and Wm. Smith Greig, Senior Counsel, on the brief), United States Securities and Exchange Com-

mission, Washington, DC, for Plaintiff–Appellee.

Before: CARDAMONE, CABRANES, and POOLER, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

These consolidated cases [1] concern a "pump-and-dump" securities fraud scheme whereby certain defendants artificially inflated a company's stock price, sold high, and left investors holding nearly worthless shares when the price plummeted to a realistic value. Other defendants allegedly benefitted unjustly from the opportunity to buy shares at nominal prices and then to sell at inflated prices. The Securities and Exchange Commission ("SEC") instituted this enforcement action, alleging that defendants had violated federal securities laws by failing to register shares and by committing fraud. The SEC moved for summary judgment, which the United States District Court for the Southern District of New York (Denise Cote, *Judge*) granted. On appeal, defendants contend that the District Court's action was erroneous on several grounds, none of which we find meritorious. In this opinion, we consider two of the defendants' arguments in greater detail: (1) that the District Court should have allowed defendants to benefit from an exemption to the federal securities registration requirements [2] and (2) that the District Court exceeded its authority in granting equitable disgorgement of defendants' ill-gotten profits.

Because the District Court correctly found that the claimed exemptions do not apply to defendants' actions, and because the remedies imposed by the District Court did not exceed its equity powers, we affirm.

## BACKGROUND

We assume familiarity with our previous opinion related to this matter, *see SEC v. Cavanagh,* 155 F.3d 129 (2d Cir.1998) ("*Cavanagh II* "), and the opinions of the District Court, *see SEC v. Cavanagh,* No. 98 Civ. 1818(DLC), 2004 WL 1594818 (S.D.N.Y. July 16, 2004) ("*Cavanagh III* "); *SEC v. Cavanagh,* 1 F.Supp.2d 337 (S.D.N.Y.1998) ("*Cavanagh I* "), and recount only those facts necessary for the resolution of the issues presented. The facts below are drawn from the complaint of the SEC and the *Cavanagh III* opinion of the District Court.

WTS Transnational, Inc. ("WTS"), a Massachusetts corporation that was developing a fingerprint-verification system, required additional financing to continue its operations. As of September 30, 1997, WTS had no revenue, $655,000 in current liabilities, and only $10,000 in assets. It had yet to produce a prototype of its fingerprint verification system, which remained unpatented.

Defendants Thomas Cavanagh and Frank Nicolois, who operated an investment banking company called U.S. Milestone ("USM"), agreed to arrange fi-

---

1. For reasons substantially similar to those articulated in this opinion, we affirm the ruling of the District Court by a separate summary order filed today in *SEC v. Franklin,* No. 05–0325. Although not consolidated with the cases resolved by this opinion, *Franklin* arose from the same district court proceedings and was argued before this Court in tandem with the instant cases.

2. Section 5(a) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77e(a), prohibits the sale or delivery after sale of any security by means of interstate commerce "[u]nless a registration statement is in effect as to [the] security." Section 4(1) of the 1933 Act, 15 U.S.C. § 77d(1), exempts from the registration requirement of Section 5 "transactions by any person other than an issuer, underwriter, or dealer."

nancing for WTS. They located a shell corporation, Curbstone Acquisition Corp. ("Curbstone"), which had essentially no assets but which had registered approximately 3,500,000 shares with the SEC.[3] Curbstone's principals—including defendants George Chachas, Thomas Brooksbank, Thomas Hantges, and James Franklin—owned nearly all of Curbstone's shares. Cavanagh, Chachas, and defendant William Levy, USM's legal counsel, worked out a reverse stock acquisition, whereby Curbstone would acquire WTS, and WTS's management would replace Curbstone's.[4] The resulting merged entity was to be renamed Electro–Optical Systems Corporation ("EOSC").

WTS and Curbstone entered into a Stock Exchange Agreement ("EA") dated December 5, 1997.[5] The EA was signed on Curbstone's behalf on December 8, 1997 and on WTS's behalf between December 2 and 16, 1997. Under the EA, WTS shareholders exchanged all outstanding shares of their company for newly issued shares of Curbstone, thereby "reverse merging" the closely held WTS into the publicly traded Curbstone. The newly issued shares bore a "restrictive legend" that imposed limitations on the ability of the former WTS shareholders to trade their new Curbstone shares. The EA contained options provisions, whereby Curbstone shares would be purchased from the individuals comprising Curbstone management, and so-called "lock-up" provisions preventing those individuals from otherwise selling Curbstone shares until March 15, 1998, two months after the January 16, 1998 deadline the EA set for the closing of the reverse merger.[6]

The challenged transactions relevant to this appeal occurred on three distinct occasions. First, in late December 1997, Cavanagh and others arranged for the sale of Curbstone shares to third-party Spanish companies controlled by them, which the District Court referred to as the "Spanish Nominees." After the transaction contemplated by the EA closed on December 18, 1997, the USM defendants directly or indirectly controlled nearly all the freely tradable shares of EOSC, the entity created by

3. USM, Cavanagh, Nicolois, and other USM affiliates are occasionally referred to below collectively as "the USM defendants" to distinguish them from Curbstone and Curbstone-affiliated defendants.

4. A "reverse acquisition" (or "reverse merger") can be used as a method for a private company to become public without fulfilling the ordinary disclosure and registration obligations of a newly public company. The private company arranges to be acquired by a public company with minimal assets (i.e., a shell company) and transfers the private company's assets to the new, publicly-traded owner in exchange for the shell company's equity, and the private company's former management then runs the original company under the corporate identity of the acquiring public company. See 26 C.F.R. § 1.1502–75(d)(3); see also, e.g., Ponce v. SEC, 345 F.3d 722, 726–27 (9th Cir.2003).

5. The EA was sometimes referred to as the "Acquisition Agreement."

6. According to the District Court, the sale of Curbstone shares to entities controlled by USM defendants (as opposed to the shares being cancelled as part of the "reverse merger") "made the market fraud possible." Cavanagh III, 2004 WL 1594818, at *5. Upon execution of the EA, nearly all Curbstone shares were either (1) restricted by a legend preventing trading, (2) transferred to foreign entities controlled by the USM defendants, (3) held by Curbstone management group members pending the exercise of options by defendants, or (4) excluded from the market by "lockup" provisions preventing Curbstone management from selling their remaining shares. Therefore, when defendants subsequently sold shares to the public at inflated prices, no other sellers could undercut them and thereby restore a realistic market price.

the merger of Curbstone and WTS. Cavanagh and Nicolois intentionally inflated EOSC's share price by purchasing small lots of EOSC shares at high prices, issuing false and misleading press releases, and using the Spanish Nominees to regulate the supply of EOSC shares in the market. Second, in February 1998 the USM defendants exercised their options pursuant to the EA and transferred additional shares to the Spanish Nominees; they later sold these shares via the Spanish Nominees to the unsuspecting public. Cavanagh also distributed, often without receiving consideration, hundreds of thousands of shares to friends, relatives, and associates. Third, in mid-March 1998, Brooksbank and Franklin sold additional shares they owned, after the SEC began its investigation and contacted certain defendants. When the share price subsequently plummeted to its actual value, innocent shareholders—mostly individual investors—suffered total losses which the SEC estimates at over $15 million.

The SEC filed this civil enforcement action in the District Court on March 13, 1998 alleging violations of the registration and antifraud provisions of the federal securities laws. Defendants included the alleged ringleaders of the scheme (Cavanagh, Nicolois, and USM), as well as members of Curbstone management whose negligence was essential to the scheme's success (Chachas, Brooksbank, Hantges, and Franklin), and several "relief defen-

dants,"[7] principally recipients of gratuitous EOSC stock. The SEC sought disgorgement of the EOSC stock in question and all proceeds from sales of that stock.[8] On the SEC's motion, the District Court entered a preliminary injunction on April 20, 1998 prohibiting further trading of EOSC stock, enjoining defendants from future violations of federal securities laws, and freezing the assets of defendants and relief defendants to the extent of their profits from trading in EOSC stock. *See Cavanagh I*, 1 F.Supp.2d at 386–87. We affirmed the preliminary injunction on appeal. *Cavanagh II*, 155 F.3d at 131. Thereafter the SEC moved for summary judgment. In a comprehensive opinion dated July 15, 2004, the District Court granted the SEC's motion. *Cavanagh III*, 2004 WL 1594818, at *1.

The District Court found that Cavanagh, Nicolois, and USM violated antifraud and registration requirements of securities laws—namely Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§ 77e(a), e(c), q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)—and permanently enjoined them from further violations. The District Court also imposed civil penalties upon these three defendants of $1,000,000 each and ordered that they disgorge to the District Court all profits obtained in connection with their scheme, a combined total of $15,564,863.02, "plus in-

---

7. *See SEC v. George*, 426 F.3d 786, 798 (6th Cir.2005) ("A relief defendant (sometimes referred to as a nominal defendant) may be joined to aid the recovery of relief and has no ownership interest in the property which is the subject of litigation.") (internal quotation marks omitted); *Cavanagh II*, 155 F.3d at 136; *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir.1991).

8. The complaint sought an order compelling defendants to "account for and disgorge all proceeds they have received as a result of the

illegal conduct described" in the complaint, "together with prejudgment interest." The SEC also sought an order compelling relief defendants to disgorge profits from the sale of EOSC stock, as well as any remaining EOSC stock they held. The eventual final judgments, discussed *post*, would order all profits and stock transferred to the District Court to be deposited into a Court Registry Investment System account for eventual distribution to victims of the fraud.

terest, less any disgorgement amounts actually paid by other defendants and relief defendants." The District Court maintained jurisdiction for the purpose of overseeing the final judgment "and any plan of distribution of disgorged funds to victims of the fraud."

With respect to defendants Brooksbank, Hantges, and Franklin, the District Court found that these defendants violated registration requirements of Sections 5(a) and 5(c) of the 1933 Act and imposed civil penalties of $125,000 each, instituted a permanent injunction barring further violations, and ordered disgorgement to the District Court of a combined total of $889,275, plus interest.[9]

Upon finding that relief defendants Karen Cavanagh, Beverly Nicolois, Cromlix, LLC, and Edward C. Kaufer had received ill-gotten funds to which they had no legitimate claim, the District Court ordered Karen Cavanagh, Beverly Nicolois, and Cromlix, LLC to pay combined disgorgement of $803,660.75 and ordered Kaufer (along with Brooksbank) to pay combined disgorgement of $213,150.97. Final judg-

ment was entered on August 27, 2004, and this timely appeal followed.

On appeal, defendants argue that they are not issuers, underwriters, or dealers and that they were therefore entitled to an exemption from the securities registration requirements of the 1933 Act. Specifically, they contest the District Court's finding that they were "affiliates" of an "issuer" when the challenged transactions occurred. Defendants also challenge the "disgorgement" remedy awarded by the District Court, arguing that it exceeds the equity powers of the federal courts.

## DISCUSSION

■ In this opinion, we address two questions presented on appeal: (1) whether the District Court properly invoked the so-called "integration doctrine" associated with Section 4(1) of the 1933 Act, 15 U.S.C. § 77d(1) ("Section 4(1)"),[10] thereby preventing defendants from avoiding liability under Section 5 of the 1933 Act, 15 U.S.C. § 77e ("Section 5"),[11] and (2) whether the District Court exceeded its authority in

9. In addition to the amount for which Brooksbank, Franklin, and Hantges were found jointly and severally liable, the District Court also ordered individual disgorgement payments of $185,337.79 from Brooksbank, $50,926.50 from Franklin, and $304,654.29 from Hantges.

10. Section 4(1) of the 1933 Act states:

The provisions of Section 77e of this title [Section 5 of the 1933 Act] shall not apply to—(1) transactions by any person other than an issuer, underwriter, or dealer.

15 U.S.C. § 77d(1).

11. Section 5 of the 1933 Act, 15 U.S.C. § 77e, provides, in relevant part:

(a) Sale or delivery after sale of unregistered securities

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly-

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

. . . .

(c) Necessity of filing registration statement

It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security

. . . .

15 U.S.C. § 77e.

imposing disgorgement as an equitable remedy.

### 1. Exemptions Under Section 4(1) of the 1933 Act

Defendants Brooksbank and Franklin argue that they were not "affiliates" of Curbstone when the unregistered sales occurred and that the District Court therefore erred in treating them as "issuers" not entitled to the exemptions of Section 4(1).[12] They accordingly argue that the District Court erred in granting summary judgment to the SEC on the Section 5 violations.

■■■■ Section 5 requires that securities be registered with the SEC before any person may sell or offer to sell such securities. 15 U.S.C. § 77e.[13] Section 4(1) provides that the registration requirements of Section 5 do not apply to "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(1).[14] The term "issuer," as used in the definition of underwriter, is given broad meaning to include "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." *Id.*

§ 77b(a)(11); *see also United States v. Wolfson*, 405 F.2d 779, 782 (2d Cir.1968). The statute defines an "underwriter" as "any person who has purchased from an issuer with a view to . . . the distribution of any security." 15 U.S.C. § 77b(a)(11). A "dealer" is "any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." *Id.* § 77b(a)(12). It is well-established that an "affiliate" of the issuer—"such as an officer, director, or controlling shareholder"— "ordinarily may not rely upon the Section 4(1) exemption." *Cavanagh II*, 155 F.3d at 134 (footnote omitted).

It is not disputed that Brooksbank and Franklin, when major shareholders, officers, and directors of Curbstone, were "affiliates" of Curbstone. Defendants challenge, however, the District Court's finding that they remained affiliates when the December, February, and March sales of Curbstone/EOSC stock occurred and that they therefore cannot enjoy a Section 4(1) exemption. *See* Br. of Appellant

---

**12.** Defendants do not dispute that "affiliates" are outside the coverage of Section 4(1). *See Cavanagh II*, 155 F.3d at 134 ("Section 4(1) provides an exemption from the registration requirement of Section 5 for those who are not underwriters, issuers or dealers. A control person, such as an officer, director, or controlling shareholder, is an affiliate of an issuer and is treated as an issuer when there is a distribution of securities. Thus, an affiliate ordinarily may not rely upon the Section 4(1) exemption—he must either re-register his shares or qualify for a different exemption before undertaking to sell them.") (footnotes omitted). An "affiliate of an issuer" is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1).

**13.** To state a cause of action under Section 5, one must show "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." *Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 124 n. 4 (2d Cir.1998) (internal quotation marks omitted). Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494 (1953).

**14.** This exemption exists primarily to allow the free trading of already issued securities. *See SEC v. Culpepper*, 270 F.2d 241, 247 (2d Cir.1959).

Brookstone, at 24–25; Br. of Appellant Franklin, at 2–3.

Brooksbank argues that he may avail himself of the Section 4(1) exemption because he ceased to be an "affiliate" of Curbstone when he ceased to be a controlling shareholder, officer, or director on or about December 5–12, 1997, when the EA implementing the WTC–Curbstone merger was dated and signed.[15] In other words, according to Brooksbank, he was no longer an "affiliate" when the actions that violated Section 5 occurred—that is, in late December 1997 (when, after control of Curbstone was ceded to WTS officers and directors as contemplated in the EA, Cavanagh arranged the transfer of shares to the Spanish Nominees); in February 1998 (when defendants sold shares to the Spanish Nominees pursuant to the option provisions in the EA); and in March 1998 (when Brooksbank sold his remaining stock to the public). If no longer an "affiliate" at such times, Brooksbank would no longer be treated as an "issuer" and could therefore enjoy a Section 4(1) exemption, which is reserved for sales by persons other than "an issuer, underwriter, or dealer." 15 U.S.C. § 77d(1).

Like Brooksbank, Franklin seeks a Section 4(1) exemption. He claims to have resigned from the Curbstone board and given one of his partners a power of attorney over his shares in the summer of 1997 (that is, approximately six months before Brooksbank left Curbstone upon consummation of the EA), which he argues precludes his being considered a controlling shareholder on the dates when statutory violations took place (December 1997, February 1998, and March 1998). Franklin's alleged resignation as a director in the summer of 1997 is immaterial to his "affiliate" status, however, because when the Curbstone shares were sold in December 1997 pursuant to the EA, Franklin was still one of the four partners who owned Curbstone, and he was a beneficial owner of about one-fourth of Curbstone's shares.[16] Moreover, there is no evidence in the record supporting Franklin's claim that he conveyed a power of attorney to one of his partners. Franklin therefore had the same status as Brooksbank on the relevant dates, for each sold the bulk of his shares pursuant to the EA, and the sale of all four Curbstone partners' shares as a block was essential to the negotiation of the EA and the commission of the subsequent fraud.

■ The District Court rejected Brooksbank's and Franklin's arguments, relying principally on the "doctrine of integration," *Cavanagh III*, 2004 WL 1594818, at *20, pursuant to which certain seemingly separate transactions are treated as one when a court or the SEC analyzes whether those transactions are covered by an exemption from Section 5's registration requirements.[17] *See Cavanagh I*, 1

---

**15.** Brooksbank signed a letter of resignation dated December 12, 1997, and most of his stock was sold on or about that date as part of the "reverse merger." *But see Cavanagh II*, 155 F.3d at 132 (noting that Brooksbank's resignation was not accepted until December 18, 1997).

**16.** *See* footnote 19, *post*, and accompanying text.

**17.** The SEC standard for integrating transactions in the context of various exemptions to registration requirements—a standard courts have applied as well—evaluates

> whether (1) the different offerings are part of a single plan of financing, (2) the offerings involve issuance of the same class of security, (3) the offerings are made at or about the same time, (4) the same type of consideration is to be received, (5) the offerings are made for the same general purpose.

Non–Public Offering Exemption, 1933 Act Release No. 33–4552, 27 Fed.Reg. 11,316 (Nov.

F.Supp.2d at 363–66 (treating two transactions as one because "they were one in the minds of the individuals who structured them"); cf. Section 3(a)(11) Exemption for Local Offerings, 1933 Act Release No. 33–4434, 26 Fed.Reg. 11,896 (Dec. 13, 1961) (listing factors determining when transactions are "integrated"); cf. also *SEC v. Murphy*, 626 F.2d 633, 645–46 (9th Cir.1980) (applying factors to determine whether "integration" is appropriate); Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* § 3–C–1, at 278 (3d ed. 1995) ("The concept of 'integrating' offerings is intended to prevent an issuer from avoiding registration by structuring a transaction in two or more apparently exempt offerings (or one exempt and one nonexempt offering) when they actually should be considered a single nonexempt transaction."). When two transactions are integrated, anyone who is an "issuer, underwriter, or dealer" at the time of either transaction is placed outside the protection of Section 4(1).

The District Court reasoned that Brooksbank and Franklin were indisputably "affiliates" at the time they agreed to an acquisition that included the option and lock-up provisions as "material parts of the consideration." Accordingly, the District Court concluded that any transactions

made pursuant to these provisions "were part of the integrated transaction and cannot be excised from it." Neither Brooksbank nor Franklin has provided us with evidence in the record to dispute the District Court's conclusion that each was an affiliate during the negotiation of, and agreement to, the EA.

We agree with the District Court's determination that Brooksbank and Franklin may not rely upon Section 4(1), but we rest our conclusions on different grounds. We note first, as the District Court accurately stated, that defendants' conduct is not protected by the "safe harbor" provision of SEC Rule 144(k), 17 C.F.R. § 230.144(k).[18] Rule 144, which SEC Release No. 33–5223 states establishes a presumption that those not covered by the rule are likewise outside Section 4(1), see note 20 *post*, treats persons as "affiliates" if they have met the usual definition of an affiliate during the three months preceding an unregistered sale. Although there is some dispute about the precise date on which Brooksbank and Franklin ceased to be affiliates, they clearly remained affiliates on December 12, 1997, the date of Brooksbank's letter of resignation. Each owned nearly one-quarter of Curbstone stock until the transactions outlined in the EA were contemplated, which certainly did not occur before the EA was fully signed.[19] Fur-

16, 1962); *see, e.g., Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1140 (7th Cir.1992).

**18.** As an alternative ground for its decision, the District Court noted that regardless of the resolution of the integration doctrine question, "under SEC regulations, Brooksbank and Franklin would have retained their affiliate status for three months after control passed." Rule 144(k) states in relevant part that its requirements

shall not apply to restricted securities sold for the account of a person who is not an affiliate of the issuer at the time of the sale and has not been an affiliate during the preceding three months . . . .

17 C.F.R. § 230.144(k).

**19.** Although there is no bright-line rule declaring how much stock ownership constitutes "control" and makes one an "affiliate" under Section 4(1), some commentators have suggested that ownership of something between ten and twenty percent is enough, especially if other factors suggest actual control. *See* Sidney Ravkind, *We New Wizards of Wall Street*, 66 Tex. B.J. 120, 126 n. 32 (2003) (reviewing cases and literature). Here, the four partners sold their shares as a block including nearly all Curbstone shares.

ther, the District Court indicated that the Curbstone directors' and officers' resignations may not have been accepted before December 18, 1997. The December and February sales thus occurred well within the three-month window. The March 12, 1998 sales by Brooksbank and Franklin also occurred just within the covered time period; Brooksbank and Franklin sold their remaining shares no more than three months after ceasing to be "affiliates" by virtue of their status as controlling shareholders. Accordingly, under the three-month provision of Rule 144(k), Brooksbank and Franklin enjoy no "safe harbor" for the December, February, or March sales.

While conduct can satisfy Section 4(1) without meeting the requirements of Rule 144 (which is a nonexclusive safe harbor provision), *see* Rule 144(j), 17 C.F.R. § 230.144(j) ("Although this rule provides a means for reselling restricted securities and securities held by affiliates without registration, it is not the exclusive means for reselling such securities in that manner."), sellers seeking a Section 4(1) exemption outside Rule 144 face a difficult standard. As the SEC Release announcing Rule 144's adoption warned, "persons who offer or sell restricted securities without complying with Rule 144 are *hereby put on notice* by the Commission that in view of the broad remedial purposes of the Act and of public policy which strongly supports registration, they will have *a substantial burden of proof* in establishing that an exemption from registration is available for such offers or sales and that such persons and the brokers and other persons who participate in the transactions do so at their risk." Notice of Adoption of Rule 144, 1933 Act Release No. 33–5223, Fed. Sec. L. Rep.(CCH) ¶ 78,487, at 81,050 (Jan. 11, 1972) (emphases added).[20]

Applying the SEC's standard, we hold that Brooksbank and Franklin are precluded from obtaining relief outside the "safe harbor" provided by Rule 144 because (1) sellers who seek Section 4(1) exemptions beyond Rule 144 face "a substantial burden of proof," (2) Brooksbank and Franklin were *major* shareholders whose ownership and sale of stock was essential to the fraud, (3) Brooksbank and Franklin were undisputedly "affiliates" close in time to the unregistered sales, and (4) there exist no additional equitable arguments in defendants' favor.

We note, in addition, that even if Rule 144 were not applicable here, the affiliate status of Brooksbank and Franklin during the negotiation of and agreement to the EA adheres to the entire series of events contemplated by the EA. In other words, we are not presented here with multiple transactions that might be "integrated" into one for purposes of Section 4(1) analysis, but rather a *single* actual transaction with multiple stages. In these circumstances, a person who is an "affiliate" during the negotiation of, and agreement to, the deal may not enjoy a Section 4(1) exemption by simply abdicating his affiliate status (*e.g.*, by selling his controlling

---

**20.** We owe deference to the SEC's release. *See Gryl ex rel. Shire Pharms. Group PLC v. Shire Pharms. Group PLC*, 298 F.3d 136, 145 n. 8 (2d Cir.2002) (an SEC release "is connected to the agency's rule-making function" and thus receives deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *see also* Stuart R. Cohn, Securities Counseling for New and Developing Companies § 14:7 (2005) ("Except for public offerings, each Rule 144 alternative carries substantial risks. The S.E.C. was serious about its warnings regarding burden of proof."); *Ralston Purina Co.*, 346 U.S. at 126, 73 S.Ct. 981 ("Keeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable.").

shares or resigning as an officer or director) shortly before the parties complete the transaction. Here, defendants' role in orchestrating the transaction while they were affiliates precludes them from enjoying Section 4(1) exemptions regardless of whether they left Curbstone before the unregistered sales occurred. *See SEC v. Kern*, 425 F.3d 143, 153 (2d Cir.2005) (holding that when a putative affiliate claims a Section 4(1) exemption, the transaction is considered to include "the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public") (internal quotation marks omitted); *Geiger v. SEC*, 363 F.3d 481, 487 (D.C.Cir.2004) (holding that one "did not have to be involved in the final step of the distribution to have participated in it").

■ Registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public. It would defeat the purpose of the broad definition of an "issuer"—which includes "affiliates" because affiliates are treated as issuers under Section 4(1)—and frustrate the broad remedial goals of the securities laws, to permit affiliates, with full access to non-public information, to negotiate the terms of a sale but then escape liability simply by terminating their affiliate status immediately prior to consummating the transaction.

■ Nonetheless, it bears recalling that an individual who was an affiliate at some point during a transaction is not necessarily an affiliate at all later points in the transaction for the purposes of Section 4(1). In particular cases, we will consider a person's role, if any, in the negotiation and execution of the transaction as well as the closeness in time between that person's affiliate status and the portion of the transaction for which he seeks a registration exemption.

Here it is not disputed that both the December sales and the February option exercise were negotiated and agreed upon before and during December 1997, and thus during the time that the members of the Curbstone management group were still undisputedly "affiliates" of Curbstone and therefore "issuers" for purposes of Section 4(1).[21] Moreover, because the Spanish Nominees bought Curbstone shares from Curbstone management, the Spanish Nominees meet the 1933 Act's definition of "underwriters," thereby disqualifying those transactions from the Section 4(1) exemption.[22] The December sales occurred just days—at most—after Brooksbank and Franklin ceased being affiliates, and the provisions of the EA contemplating those sales and the February sales constituted important consideration in the overall scheme of the EA. Franklin and Brooksbank each owned about one-

---

21. The definition of "affiliate" includes "any person directly or indirectly controlling or controlled by an issuer." 15 U.S.C. § 77b(a)(11); *see Cavanagh II*, 155 F.3d at 134 ("A control person, such as an officer, director, or controlling shareholder, is an affiliate of an issuer and is treated as an issuer when there is a distribution of securities.").

22. The Spanish Nominees were "underwriters" because the "affiliate" status of Curbstone management caused Curbstone management to be considered "issuers," and an

"underwriter" is defined as "any person who has purchased from an issuer with a view to ... the distribution of any security." 15 U.S.C. § 77b(a)(11). As the District Court found, in a finding that is not erroneous, much less clearly erroneous, the Spanish Nominees purchased the EOSC shares with plans to resell them. Indeed, the resale of shares through the Spanish Nominees was essential to the fraud. *See Cavanagh III*, 2004 WL 1594818, at *5–*9.

fourth of Curbstone's shares during the negotiation of the EA.

The transactions giving rise to this enforcement action could not have occurred if the organizers had not exercised control over nearly all of the EOSC shares in the market between the December signing of the EA and the March intervention of the SEC, making Franklin's and Brooksbank's December and February sales of shares essential to the purpose of the EA. The December and February sales are therefore, along with the EA, part of a single transaction. Similarly, the March sales were contemplated by the EA because the "lock-up" provisions—which allowed those defendants selling shares to the public through the Spanish Nominees to control nearly all freely tradable shares of EOSC—anticipated that former members of Curbstone management would eventually sell their shares to the public as well.[23] Thus the March sales likewise are combined into a single transaction with the EA and the earlier sales.

In light of defendants' role in the orchestration and negotiation of the fraudulent transactions, their mere departure from Curbstone before the wrongful sales ultimately occurred does not permit them to avail themselves of Section 4(1), which exists to shield from the registration require-

ments of Section 5 the sale of securities already legitimately in the market.

### 2. The Availability of "Disgorgement" in Equity Under Grupo Mexicano

▬ Defendant Hantges argues that the District Court exceeded its equity powers by imposing a "disgorgement" remedy.[24] The remedy consists of factfinding by a district court to determine the amount of money acquired through wrongdoing—a process sometimes called "accounting"—and an order compelling the wrongdoer to pay that amount plus interest to the court.[25] Although "disgorgement" is a well-established remedy in the Second Circuit, particularly in securities enforcement actions, *see SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir.1987); *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102 (2d Cir.1978) (Friendly, J.); *see also* 15 U.S.C. § 78u–2(e) (authorizing SEC and other agencies to "enter an order requiring accounting and disgorgement" in administrative enforcement proceedings), this case is the first to present squarely the question whether this remedy survives the Supreme Court's teachings in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999), on the prop-

---

**23.** Because the "lock-up" provisions precluded the sale of 200,000 shares while defendants drove up the stock price—more than the 150,000 shares purchased in February under the EA's option provision—the timing of the March sales had great importance to the overall purpose and effectiveness of the EA. The record suggests that while negotiating the EA, the parties envisaged the eventual March sales by Brooksbank and Franklin at issue here.

**24.** The history of the use of "disgorgement" to mean the giving up of wrongly-gotten assets is uncertain. Although the *Oxford English Dictionary* traces such use to 1837, *see*

*id.* (2d ed.1989) ("the disgorgement of past plunder" (quoting *Whig–Radical Prosperity*, Blackwood's Edinburgh Mag., Feb. 1837, at 145, 146)), in 1974 it "appear[ed] to be a term of modern vintage" in legal contexts to one federal court, *see SEC v. R.J. Allen & Assocs., Inc.*, 386 F.Supp. 866, 880 (S.D.Fla.1974) (ascribing increase in term's use to SEC enforcement actions).

**25.** Because the remedy is remedial rather than punitive, the court may not order disgorgement above this amount. *See SEC v. Tex. Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir.1971).

er scope of equitable remedies in the federal courts. We hold that it does.

In a securities enforcement action, as in other contexts, "disgorgement" is not available primarily to compensate victims.[26] Instead, disgorgement has been used by the SEC and courts to prevent wrongdoers from unjustly enriching themselves through violations, which has the effect of deterring subsequent fraud. A district court order of disgorgement forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court, even if it exceeds actual damages to victims. *See Tome*, 833 F.2d at 1096. In the words of Judge Friendly, "[T]he primary purpose of disgorgement is not to compensate investors. Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched." *Commonwealth Chem. Sec., Inc.*, 574 F.2d at 102. The emphasis on public protection, as opposed to simple compensatory relief, illustrates the equitable nature of the remedy. *See id.; SEC v. Petrofunds, Inc.*, 420 F.Supp. 958, 960 (S.D.N.Y. 1976) (Weinfeld, J.) (noting that SEC action "springs out of the policy of public enforcement of the provisions of the securities laws and exists as an exercise of the equity powers of the federal courts"). Upon awarding disgorgement, a district court may exercise its discretion to direct the money toward victim compensation or to the United States Treasury. *See SEC v. Fischbach Corp.*, 133 F.3d 170, 175–76 (2d Cir.1997).

Section 11 of the Judiciary Act gave federal courts jurisdiction over "all suits ... in equity." 1 Stat. 73, 78 (1789); *see also* U.S. Const. art. III, § 1 (vesting "judicial Power of the United States" in a Supreme Court and "such inferior Courts as the Congress may from time to time ordain and establish"). The Supreme Court has explained that the equity jurisdiction conferred on federal courts by the Constitution and the Judiciary Act "is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Grupo Mexicano*, 527 U.S. at 318, 119 S.Ct. 1961 (quoting *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568, 59 S.Ct. 657, 83 L.Ed. 987 (1939)). In *Grupo Mexicano*, the Supreme Court held that the district court lacked authority to enter a prejudgment order enjoining a debtor from moving its assets—to which the plaintiff general creditor had no specific claim of entitlement—outside the district court's geographical jurisdiction.[27] The Court concluded that the power to issue such an order lay beyond the equitable jurisdiction of the federal

---

**26.** For a discussion of disgorgement in other areas of the law, particularly the law of contracts, *see generally* E. Allan Farnsworth, *Your Loss or My Gain? The Dilemma of the Disgorgement Principle in Breach of Contract*, 94 Yale L.J. 1339 (1985). Professor Farnsworth notes that while the "disgorgement principle" is fairly new to commercial contract law—which normally limits recovery to expectation damages or restitution of benefit conferred by the non-breaching party—equity courts forced defendants to surrender profits irrespective of plaintiffs' actual losses in certain cases such as breach of fiduciary duty and breach of contracts for sale of goods and land. *See id.* at 1351–69.

**27.** The injunction's purpose was to ensure the effectiveness of an ultimate remedy. Such injunctions, known as *"Mareva* injunctions" for the second English case to issue one, *see Mareva Compania Naviera S.A. v. Int'l Bulkcarriers S.A.*, (1975) 2 Lloyd's Rep. 509, are now available in equity in England and Canada, among other places. *See* H. Patrick Glenn, *Conflicting Laws in a Common Market? The NAFTA Experiment*, 76 Chi.-Kent L.Rev. 1789, 1804 (2001).

courts, a conclusion that resulted from the Court's negative answer to the question of "whether the relief respondents requested here was traditionally accorded by courts of equity." *Id.* at 319, 119 S.Ct. 1961.

Accordingly, the question here whether the District Court acted beyond its equitable powers requires an inquiry into whether the remedies available at chancery in 1789 included disgorgement, a question we have not previously considered.[28] We therefore must turn to historical sources to determine whether equity courts traditionally awarded disgorgement of ill-gotten assets.[29]

First, we note that our inquiry concerns not the name used by equity courts and commentators for historical remedies but rather their specific actions and the resulting practical consequences. Thus, if one equity court compelled "restitution" of wrongly gained assets while another ordered "disgorgement" and a third held that cheating trustees must "make good the trust" from which they stole, the remedies may have been identical. In this case, the District Court ordered defendants and relief defendants to "disgorge"—that is, to surrender to the District Court—profits from securities fraud either (in the case of defendants) because they committed or negligently abetted the fraud or (in the case of relief defendants) because they profited from the fraud and have no just claim to their profits. The discussion below will demonstrate that although the term "disgorgement" became common only recently, equity courts have traditionally awarded analogous forms of relief under a variety of names.

Commentators have observed that courts of equity now have, and have had for centuries, jurisdiction over claims arising from improper acquisition of assets. Lord Coke wrote that "[t]hree things are to be judged in [the] Court of Conscience: Covin, Accident, and breach of confidence." [30] 4 Edward Coke, *Institutes of*

**28.** Although before *Grupo Mexicano* was decided we referred in *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 95 (2d Cir.1978), to restitution as a "historic equitable remedy," our discussion there concerned whether a claim seeking disgorgement sounded in law or equity, which in turn determined whether the right to a jury trial guaranteed by the Seventh Amendment for "[s]uits at common law" applied. *Id.;* U.S. Const. amend. VII. That case did not explicitly consider whether the "historic" disgorgement power dates back to the earliest years of the Republic. The one court that, to our knowledge, has examined the question after *Grupo Mexicano* is the District Court for the Southern District of Texas, which held that federal courts sitting in equity do have the power to order disgorgement. *See Newby v. Enron Corp.*, 188 F.Supp.2d 684, 702–03 (S.D.Tex. 2002).

**29.** Hantges argues that the inquiry should be narrower, focusing on whether equity courts traditionally "granted a government representative the remedy of disgorgement based on a defendant's violation of a general statute."

*See* Br. of Appellant Hantges, at 31. That argument, however, is inapposite because chancery courts go "much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *See Grupo Mexicano*, 527 U.S. at 326, 119 S.Ct. 1961 (quoting *United States v. First Nat'l City Bank*, 379 U.S. 378, 383, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965)). Because the challenged remedy awarded in this case was available to *private* equity plaintiffs in chancery in 1789, we need not, and do not, decide today what *additional* latitude a federal court might have in awarding equitable remedies in cases like this one, which implicate a broader public interest.

**30.** "Covin" is a "secret conspiracy or agreement between two or more persons to injure or defraud another." *Black's Law Dictionary* 394 (8th ed.2004); *see also Swayze's Lessee v. Burke*, 37 U.S. 11, 16, 12 Pet. 11, 9 L.Ed. 980 (1838) (distinguishing fraud, which a single malfeasant can perpetrate, from covin, which requires multiple wrongdoers).

the Laws of England 84 (London, M. Flesher 1644) (1797 ed. reprinted 1986) ("The third is breach of trust and confidence, whereof you have plentiful authorities in our books."). Blackstone expressed a similar idea: "[I]t hath been said, that *fraud, accident,* and *trust* are the proper and peculiar objects of a court of equity." 3 William Blackstone, *Commentaries on the Laws of England* 431 (photo. reprint 1992) (1768). Although noting that the maxim quoted oversimplified the overlapping jurisdictions of law and equity, Blackstone wrote that a "technical *trust* indeed, created by the limitation of a second use, was forced into a court of equity ... [and] ha[s] ever since remained as a kind of *peculium* in those courts."[31]  *Id.* at 431–32; *see also* John Beames, *The Elements of Pleas in Equity* 70 (New York, O. Halsted 1st Am. ed. 1824) (including "[m]atters of trust and confidence" among subjects of equity jurisdiction); *see also Mertens v. Hewitt Assocs.,* 508 U.S. 248, 257, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (considering distinction between law and equity for purposes of interpreting Employee Retirement Income Security Act of 1974 and noting that *"all* relief available for breach of trust could be obtained from a court of equity"); *Lessee of Smith v. McCann,* 65 U.S. (24 How.) 398, 407, 16 L.Ed. 714 (1860) (indicating that in a state maintaining distinct courts of law and equity, "the court of chancery ... has the exclusive jurisdiction of trusts and trust estates," as it did in England).

Early writings on equity recognized the Chancellor's power to compel disgorgement of wrongly gained assets. *See* Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England*

*and America* 423–504 (photo. reprint 1972) (1835) (describing remedy of "account," by which chancery ordered an accounting of assets so that wrongly gained profits might be recovered); *id.* at 487–88 (equitable restitution in cases of fraud); *id.* at 490–91 (disgorgement of profits upon waste); 2 John Fonblanque, *A Treatise of Equity* 168 (Philadelphia, A. Small 2d Am. ed. 1820) ("[A] trustee must, especially in equity, make good the trust."); *see also id.* at 171 n.(b) (concluding that "breach of trust" is "a case for the consideration of courts of equity"). Modern works on restitution trace the remedy's history to ancient cases in equity. *See Restatement of the Law of Restitution, Quasi Contracts and Constructive Trusts,* Pt. I, at 5 (1937) ("Some of the earliest bills in chancery were bills for restitution, such as bills for the recovery of property obtained by fraud . . . ."); *see also* 1 Dan B. Dobbs, *Law of Remedies* § 4.3(1), at 587–89 (2d ed.1993) (discussing equitable remedies of constructive trust and accounting for profits). That the term "disgorgement" has entered common legal parlance only recently cannot obscure that the ancient remedies of accounting, constructive trust, and restitution have compelled wrongdoers to "disgorge"—*i.e.,* account for and surrender—their ill-gotten gains for centuries. *See United States ex rel. Taylor v. Gabelli,* 2005 WL 2978921, at *5 (S.D.N.Y. Nov.4, 2005) (describing disgorgement of profits from fraud as "a 'classic' restitutionary remedy inherently distinct from compensable damages" awarded at law); *Dobbs, ante,* at 589 (noting that in cases of constructive trust, in which remedy need not equal actual damages, "the effect can be to

---

**31.** Equity courts imposed duties on trustees under "uses" that the law courts, responding to a statute aimed at restricting certain dispositions of real property, refused to enforce. But for the availability of equitable relief, such trustees could have breached with impunity the duties they had assumed. *See* Stewart E. Sterk, *Asset Protection Trusts: Trust Law's Race to the Bottom?,* 85 Cornell L.Rev. 1035, 1040–42 (2000).

give the plaintiff the gain a defendant makes from the sale of the plaintiff's property and any reinvestment of the funds").

English equity courts compelled the repayment (in effect, "disgorgement") of ill-gotten gains in cases decided before our independence. For example, in *Garth v. Cotton*, 27 Eng. Rep. 1182, 1196, 1 Ves. Sen. 524, 546 (Lord Chancellor's Court 1753), contingent remaindermen sought relief in equity when a life tenant and trustees conspired to defraud the remaindermen by selling timber from the relevant estate and dividing the proceeds among themselves. The plaintiff remainderman, who lacked a remedy at law for now-obscure reasons related to English land law of the time, sought an order compelling the wrongdoers to give him the proceeds of the asserted waste of the land's assets. *Id.* Lord Chancellor Hardwick obliged, holding that "a reconveyance is just" and ordering that the proceeds of the timber sale, plus interest, go to benefit the estate. *Id.* at 1199; *see also Willoughby v. Willoughby*, 99 Eng. Rep. 1366, 1 Term. Rep. 763 (Lord Chancellor's Court 1756) (ordering, at the request of a widow cheated of her legacy by her eldest son's collusion with a trustee and a banker, an accounting of the estate's assets, the sale of the estate, and payment to the widow and her other children from the proceeds).

American courts also awarded equitable remedies similar to modern disgorgement in cases decided around the time of our nation's founding. For example, in *Cadwallader v. Mason*, Virginia's High Court of Chancery considered in 1793 the case of a mortgagor who improperly retained possession of land after the mortgage had been satisfied. George Wythe, *Decisions of Cases in Virginia by the High Court of Chancery* 58 (1795), *reprinted at id.* 188–89 (2d ed. 1852), 2 Va. 185. The rightful owner, who had reclaimed the land

through an action at law, sought relief in equity to recover the profits the mortgagor had reaped in the interim. Holding that the mortgagor "may [not] thus justly enrich himself," the court of equity demanded that the mortgagor "account for such after-taken profits" and give restitution to the landowner. *Id.* The rule against unjust enrichment compelled an award equal to the defendant's gain, regardless of how much money the plaintiff actually would have earned from the land during the mortgagor's wrongful possession.

A Pennsylvania case of the same vintage applied similar reasoning to award devisees the rent collected on their land during the delay between the testator's death and their actual possession. *See Haldane v. Fisher*, 2 U.S. 176, 2 Dall. 176, 1 L.Ed. 338, 1 Yeates 121, 127 (1792) ("If a man receives my rent, it . . . . may . . . be recovered in equity."); *see id.* at 130 (Yeates, J., concurring) ("misrepresentation or concealment" is clearly "a sufficient foundation for chancery to decree an account to be taken of the rents and profits") (emphasis omitted).

Because chancery courts possessed the power to order equitable disgorgement in the eighteenth century, we hold that contemporary federal courts are vested with the same authority by the Constitution and the Judiciary Act. Accordingly, the argument that the District Court exceeded its equitable powers fails.

## CONCLUSION

In sum, we hold that:

(1) individuals who are affiliates of a company during the negotiation of, and agreement to, a transaction cannot, pursuant to Section 4(1) of the 1933 Act, escape the securities registration requirements of Section 5 of that Act by terminating their affiliate status shortly before the comple-

tion of the transaction, especially where, as here, the transaction is outside the "safe harbor" provided by SEC Rule 144; and

(2) federal courts possess authority under the Constitution and the Judiciary Act to impose the equitable remedy of disgorgement.

Having considered and rejected the remainder of defendants' arguments on appeal, we affirm, on the record before us, the judgment of the District Court.